SIGISMOND J. STOJOWSKI et al., as Assignees of Bank Polski, Respondents, v. BANQUE DE FRANCE, Defendant.
JOHN J. MCCLOSKEY, JR., as Sheriff of the City of New York, Appellant. (Two Actions.)

Argued February 26, 1945; decided April 5, 1945.

*Sidney Posner, A. G. Grayzel, Harry Katz* and *Jacob J. Sachs* for appellant. I. Restoration of the gold sued for in consideration of discontinuance of the actions and dissolution of the attachments constituted a settlement under subdivision 2 of section 1558 of the Civil Practice Act and poundage is to be computed under such subdivision. (*Pritchard* v. *The Bank of California,* 51 Barb. 184; *Bruskin* v. *Diamond Trading Co.,* 182 Misc. 444; *Morowitz* v. *Dadourian Export Corp.,* 179 Misc. 373; *Green River Distilling Co.* v. *Mass. B. & Ins. Co.,* 234 N. Y. 109; *Esselstyn* v. *Union Surety & Guaranty Co.,* 82 App. Div. 474; *Matter of Dempsey* v. *Lynch Co., Inc.,* 175 Misc. 710, 261 App. Div. 829; *Lawlor* v. *Magnolia Metal Co.,* 2 App.

Div. 552, 149 N. Y. 591; *Watts, Watts & Co.* v. *Unione Austriaca etc.*, 248 U. S. 9; *Riddell* v. *Fuhrman*, 233 Mass. 69; *The Pietro Campanella*, 47 F. Supp. 374; *The Santa Lucia*, 44 F. Supp. 793; *Buxbaum* v. *Assicurazioni Generali*, 34 N. Y. S. 2d 480, 264 App. Div. 855.)    II. The Sheriff earned his poundage upon making the levies and thereby acquired a vested right to receive poundage computed under the statute in force at that time. (*Buxbaum* v. *Assicurazioni Generali*, 175 Misc. 785; Civ. Prac. Act, § 917, subd. 2; § 1558; *Miller* v. *Miller*, 108 App. Div. 310; *Jones* v. *Gould*, 114 App. Div. 120; *Martin* v. *Berwick*, 142 N. Y. S. 470; *Prahl Construction Corporation* v. *Jeffs*, 126 Misc. 802; *Wilkinson* v. *Raymond*, 80 App. Div. 378; *In re Cowen Hosiery Co.*, 286 F. 351, 264 U. S. 426; *Lawlor* v. *Magnolia Metal Co.*, 2 App. Div. 552, 149 N. Y. 591; *Barron* v. *Tart*, 18 Ala. 668; *United States* v. *Heth*, 3 Cranch 399; *Matter of Miller*, 231 App. Div. 684.)    III. The 1943 amendment (L. 1943, ch. 523) to subdivision 2 of section 1558 of the Civil Practice Act does not in terms apply to antecedent levies, nor may it be construed to apply retroactively to such levies and thereby divest the Sheriff of poundage earned thereon.    (*Buxbaum* v. *Assicurazioni Generali*, 175 Misc. 785; *Addiss* v. *Selig*, 264 N. Y. 274; *People* v. *Cohen*, 245 N. Y. 419; *Matter of Berkovitz* v. *Arbib & Houlberg*, 230 N. Y. 261; *Cameron et al.* v. *N. Y. & M. V. W. Co. et al.*, 133 N. Y. 336; *Village of Champlain* v. *McCrea*, 165 N. Y. 264; *People* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 570; *Close* v. *Noye*, 147 N. Y. 597; *Hastings* v. *Byllesby & Co. [Granberry]*, 293 N. Y. 413; *United States* v. *Heth*, 3 Cranch 399; *N. Y. & Oswego M. R. R. Co.* v. *Van Horn*, 57 N. Y. 473; *People ex rel. Wood* v. *Denton*, 41 App. Div. 386; *People ex rel. Jackson* v. *Potter*, 47 N. Y. 375.)    IV. If applied retroactively, chapter 523 of the Laws of 1943 is special legislation, local in effect, which is invalid because not enacted in accordance with section 11 of article IX, and section 8 of article IX, of the State Constitution.    (*Matter of Mayor, etc., of New York [Elm St.]*, 246 N. Y. 72; *Schieffelin* v. *McLaughlin*, 127 Misc. 56; *Schieffelin* v. *Kelliher*, 125 Misc. 305, 215 App. Div. 770; *People ex rel. Fallon* v. *Wright*, 150 N. Y. 444; *Matter of Winkler* v. *Sheriff of Queens County*, 256 App. Div. 770.)    V. If applied retroactively, the statute bestows a gift of the city's money upon

respondents in violation of the provisions of section 1 of article VIII, of the State Constitution. (*People ex rel. Rodgers* v. *Coler,* 166 N. Y. 1; *Stemmler* v. *Mayor, etc., of New York,* 179 N. Y. 473; *Bush* v. *Board of Supervisors,* 159 N. Y. 212; *Matter of Green,* 166 N. Y. 485; *Matter of Ramon Giuteras,* 122 Misc. 523, 214 App. Div. 722.) VI. If applied retroactively, the statute deprives the City of New York through its officer, the Sheriff, of a vested right to poundage in violation of section 6 of article I of the State Constitution. (*Miller* v. *Miller,* 108 App. Div. 310; *Benson* v. *The Mayor, etc. of New York,* 10 Barb. 223.)

*John Foster Dulles* and *Frank J. Berberich* for respondents. I. The situation is squarely covered by subdivision 18 of section 1558 of the Civil Practice Act, pursuant to which poundage is $10,175. (*Esselstyn* v. *Union Surety & Guaranty Co.,* 82 App. Div. 474; *Matter of Dempsey* v. *Lynch Co., Inc.,* 175 Misc. 710, 261 App. Div. 829.) II. Subdivision 2 of section 1558 can in no event be applicable, because, on the facts there has been no " settlement ". (*Barrett* v. *The Third Avenue R. R. Co.,* 45 N. Y. 628.) III. If there were a " settlement " and if subdivision 2 of section 1558 were applicable, then the poundage formula would be that prescribed by chapter 523 of the Laws of 1943, since (a) that is the clear intent of that law; (b) there is no constitutional obstacle to giving effect to that intent. (*Murdoch* v. *Grifenhagen,* 100 Misc. 252, 182 App. Div. 919, 229 N. Y. 528; *Philippine Vegetable Oil Co.* v. *Pitou,* 105 Misc. 634, 189 App. Div. 899; *Campbell* v. *Cothran,* 56 N. Y. 279; *Flack et al.* v. *The State of New York,* 95 N. Y. 461; *Plummer* v. *International Power Co.,* 88 App. Div. 452; *Matter of Barker,* 230 N. Y. 364; *Conner* against *The Mayor, &c. of New York,* 5 N. Y. 285; *McGrath* v. *Grout,* 171 N. Y. 7; *City of New York* v. *Village of Lawrence,* 250 N. Y. 429; *Finn* v. *City of New York,* 282 N. Y. 153; *Howard et al.* v. *Moot,* 64 N. Y. 262.)

LEHMAN, Ch. J. The plaintiffs, as assignees of the Bank of Poland instituted in 1941 two identical actions to recover damages for the alleged conversion by the Bank of France of gold of the value of $64,000,000 which belonged to the Bank of Poland. In those actions the Sheriff of the City of New York levied warrants of attachment against the property of the defendant Bank of France. The Bank of France appeared in the actions and

answered the complaints. On March 22, 1944, the actions were discontinued without costs and the warrants of attachment and the levies thereunder were vacated by orders of the Supreme Court, entered upon the stipulation of the attorneys of the parties and the consent of the Sheriff. The orders provide " that the poundage fee of the Sheriff of the City of New York, in an amount to be hereafter judicially determined or to be hereafter agreed upon between the plaintiffs and the Sheriff, be paid by the plaintiffs herein." Thereafter the plaintiffs moved in each action for an order " fixing $10,175 as the amount of poundage fee due to be paid * * *. to the said Sheriff in respect of the attachments " in the two actions, and the Sheriff moved in each action for an order fixing $640,681.41 as the amount of the poundage fee to be paid by the plaintiffs in respect to the attachments. The motions of the plaintiffs were granted and the motions of the Sheriff were denied by separate orders which were unanimously affirmed by the Appellate Division. The Sheriff has appealed to this court by permission of the Appellate Division from the orders of affirmance.

The fees of a sheriff are regulated by, and must be fixed in accordance with, the provisions of section 1558 of the Civil Practice Act. At the time the actions were begun and at the time the levies were made that section provided in subdivision 2: " If the action is settled either before or after judgment, the sheriff is entitled to poundage upon the value of the property attached, not exceeding the sum at which the settlement is made ".

Subdivision 18 of the same section, as amended by chapter 264 of the Laws of 1941, in effect when the actions were instituted, provides that: " In all counties where a levy has been made under a warrant of attachment and the warrant of attachment is vacated or set aside by order of the court, the sheriff is entitled to poundage upon the value of the property attached not exceeding the amount specified in the warrant, and such additional compensation for his trouble and expense in taking possession and preserving the property as the judge issuing the warrant allows, and the judge or court may make an order requiring the party at whose instance the attachment is issued to pay the same to the sheriff; and when said attachment has been otherwise discharged by order of the court, he shall be entitled to the poundage

aforesaid and to retain the property levied upon until his fees and poundage are paid by the party at whose instance the attachment is discharged; provided that if a warrant of attachment is vacated or set aside by order of the court, the maximum amount upon which poundage shall be computed shall be one million dollars even though the value of the property attached shall exceed such amount.''

Before the motions were made to fix the amount of the poundage fees payable to the Sheriff, subdivision 2 was amended to provide that the '' maximum amount upon which such poundage shall be computed shall be one million dollars even though the value of the property attached shall exceed that amount.'' (L. 1943, ch. 523.) The éffect of the amendment is to impose the same limitation upon the amount of the fees payable under subdivision 2 as the Legislature had previously imposed upon the amount of fees payable under subdivision 18 where the warrant is vacated or set aside.

The Sheriff contends that the actions were '' settled '' within the meaning of subdivision 2 of section 1558 and that under that settlement the Bank of Poland recovered the gold which the plaintiffs alleged in their complaints was converted by the Bank of France and that the poundage fees must therefore be computed on the value of that gold. The Sheriff contends, too, that the amendment made in 1943 to subdivision 2 was not intended to apply on the computation of the poundage fee payable upon a levy made before the amendment took effect and that if intended to apply to such a levy the amendatory statute would be unconstitutional. The plaintiffs on the other hand contend that since the warrants of attachment and the levies made thereunder were '' vacated and set aside by order of the court,'' the poundage fees must be computed in accordance with the provisions of subdivision 18 '' upon the maximum amount of one million dollars '' as provided by that subdivision at the time the levies were made; but that even if the court should hold that subdivision 2 governs, the computation of fees must be made subject to the same limitation though that limitation was imposed by a statute enacted after the levies were made.

The circumstances are not in dispute which induced the attorneys for the parties to enter into a stipulation providing for the entry of orders discontinuing the actions and vacating the warrants of attachment and the levies made thereunder. Cases

and bags containing 1,830,018.3 ounces of fine gold of the value of $64,050,641.30 belonging to the Bank of Poland were in France in May, 1940. The plaintiffs in their complaints in the actions begun in 1941 in behalf of the Bank Polski, hereinafter referred to as Bank of Poland, alleged that these cases and bags were delivered in May, 1940, to Banque de France, hereinafter referred to as Bank of France, for shipment to the United States or Canada and were converted by Bank of France. In its answers served in September, 1942, the Bank of France denied that the cases and bags containing gold were " ever at any time delivered to the defendant " or that " any agreement was ever concluded between Bank Polski and the defendant whereunder any such gold was to be delivered to the defendant." In November, 1942, the Bank of France doing business in France, then under control of Germany, became an " alien enemy " of the United States. Because of its status as an " alien enemy " the New York attorneys for the defendant could not thereafter communicate with it. Though under the Trading with the Enemy Act (U. S. Code, tit. 50, Appendix) these attorneys could still defend the actions against the " enemy alien," their authority did not extend beyond such defense, nor could the " alien enemy " enter here into a binding agreement even if it had conferred upon its attorneys plenary power to represent it.

At the time the plaintiffs began these actions in behalf of the Bank of Poland, they had information that the cases and bags containing the gold belonging to that bank had been shipped from Paris to prevent its seizure by the Germans and had arrived at the sea coast of France on June 9, 1940, and were shipped on a French vessel from there to Dakar, in West Africa. The controversy was upon the question whether such shipment constituted a conversion of the gold by Bank of France. In the Spring of 1943, the French Committee of National Liberation, which then was the de facto governmental authority in French West Africa and was recognized as such authority by the United States, British and Polish governments and which collaborated with the United Nations, informed the Bank of Poland that cases and bags presumably containing the gold were still in French West Africa and were under the control of the Committee. The Committee recognized that the gold which had been sent to West Africa was the property of the Bank of Poland

and was prepared " in principle " to permit the Bank of Poland to repossess itself of its own property. The Bank of Poland was willing to discontinue its actions against the Bank of France for conversion of its gold if it regained possession of the gold. The Bank of France had made no claim to the gold and indeed, as we have said, had denied that the gold had ever been delivered to it. It had no control of the gold found in French West Africa and its consent was not necessary to perfect the title of Bank of Poland to its gold or to give effect to any agreement which might be made between Bank of Poland and the French Committee of National Liberation for the delivery of the gold by the Committee to Bank of Poland. Its consent to a discontinuance of the actions would, however, be important if the rights of the parties were to be restored to the same position as before the actions were brought; and the attorneys authorized to defend the actions were willing to consent to a discontinuance upon such terms and had the power to give such consent. The French Committee of National Liberation desired that the pending actions be thus discontinued when the Bank of Poland regained possession of its property and so did the Bank of Poland. Accordingly an agreement was made at Algiers in December, 1943, between the Bank of Poland and the French Committee of National Liberation which provided that the French Committee of National Liberation undertakes to deliver the cases of gold to the Bank of Poland and the Bank of Poland undertakes on its side "to bring about termination by discontinuance of the law suits which have been instituted in the United States against the Bank of France with reference to the cases in question. The conditions of this discontinuance are to be such that, on the one hand, it will take effect on delivery of the cases and, on the other hand, as a consequence of said delivery, all the incidents of the lawsuits will disappear and in particular there will not survive for the Bank of France any blocking of its assets or any loss except the expenses of its lawyers." The attorneys for the Bank of France then signed the stipulation that the actions be discontinued without costs to either party as against the other.

We find in these undisputed facts no basis for a conclusion that the actions between the assignees of Bank of Poland and the Bank of France have been " settled " and that the value of the gold delivered by the French Committee of National Libera-

tion to the Bank of Poland is a " sum at which the settlement is made." The term " sum at which the settlement is made " can refer only to money or other benefit received as the result of an agreement of the parties determining the controversy between them. Here, the controversy between Bank of Poland and Bank of France was upon the question whether the Bank of France had wrongfully dealt with gold which belonged to Bank of Poland. There was, as we have said, no controversy about the ownership of the gold. The Bank of France made no claim to it. It denied only that it had wrongfully meddled with it and that it was responsible for its loss. The lost gold when found in French West Africa was delivered to Bank of Poland not because the Bank of France agreed to its delivery but because the French Committee of National Liberation, exercising authority in that territory and having control of the gold, recognized the title of the Bank of Poland and was willing to deliver the gold to its rightful owner. True, Bank of Poland agreed with the Committee that upon such delivery the pending actions should be discontinued, and the consent of the Bank of France to the discontinuance of the actions removed an obstacle which otherwise might have blocked the delivery of the gold to its owner by the French Committee; but Bank of France was not and could not be consulted as to whether the delivery should be made; did not and could not lawfully agree that the gold should be delivered and did not and could not lawfully agree to the settlement of the controversy between it and Bank of Poland. Since the actions though discontinued were not settled by agreement of the parties and since the gold was delivered to Bank of Poland by agreement with the Committee, acting as a governmental authority and not as agent of Bank of France, the gold received by Bank of Poland is not " the sum at which the settlement is made " within the meaning of subdivision 2 and the fee of the Sheriff cannot be computed under that subdivision.

Even if the poundage fees were computed as provided in that subdivision, the limitation imposed by chapter 523 of the Laws of 1943 would apply to the levies made herein. The statute in express terms provides that it " shall be applicable to all actions and proceedings now pending as well as to all actions and proceedings hereafter commenced " and the plain intent of the Legislature would be thwarted by a construction which would

exclude from its scope levies previously made in pending actions. Nor do we find any restriction in the Constitution which would render the statute invalid when applied to levies previously made. The Sheriff in making a levy under a warrant of attachment exercises a governmental function conferred upon him by the State (*Finn* v. *City of New York*, 282 N. Y. 153) and the fees payable for the exercise of that function belong not to him, but to the city as a governmental agency. The amount of the fees to which the Sheriff might be entitled for the performance of his official duties could not be fixed while the actions were pending and undetermined by judgment, order, or agreement. The right of the State to relinquish or change an inchoate right to fees payable to a governmental officer or to a civil subdivision of the State cannot be challenged on the ground that it violates the mandate of the Constitution that the State may not deprive a person of property without due process or that it impairs the obligation of a contract. (*Robertson* v. *Zimmermann*, 268 N. Y. 52, and cases there cited.)

The Legislature in the amendatory statute has placed a limit upon the fees payable to a sheriff in circumstances, where in its opinion, such fees would otherwise be unreasonably large. Even if it be true that in no county outside of the City of New York, and perhaps in no county except the County of New York, has a levy been made in a pending action for which the fees payable to the Sheriff exceed the permitted limit, yet the statute applies to the fees of every Sheriff and in every part of the State whenever the Sheriff would otherwise be entitled to fees which exceed that limit, and it is plain that such a statute is general both in terms and in effect.

The orders should be affirmed, with one bill of costs.

LOUGHRAN, LEWIS, CONWAY, DESMOND, THACHER and DYE, JJ., concur.

Orders affirmed, etc.